1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  ADRIAN ARMANDO CHAPARRO,      )   No. C 14-4955 LHK (PR)
                                 )
12           Plaintiff,          )   ORDER GRANTING
                                 )   DEFENDANTS' MOTION FOR
13      v.                       )   SUMMARY JUDGMENT
                                 )
14  WARDEN C.E. DUCART and       )   (Docket Nos. 21, 29, 32, 33, 40)
    CORRECTIONAL OFFICER E.      )
15  CONTRERAS,                   )
                                 )
16           Defendants.         )
    _____)

17
18       Plaintiff, a California state prisoner proceeding *pro se*, filed a civil rights complaint

19  against prison officials at Pelican Bay State Prison ("PBSP"), pursuant to 42 U.S.C. § 1983.

20  Plaintiff claims that defendants violated his right to free exercise of his religion.  Defendants

21  have moved for summary judgment on the merits, and on the basis of qualified immunity.[1]

22  Plaintiff has filed an opposition,[2] and defendants have filed a reply.

23       For the reasons stated below, and after a review of the record, the court concludes that

24  plaintiff has not provided sufficient evidence to preclude summary judgment.  Accordingly, the

25
26       [1]  Defendants' motion to stay discovery is DENIED as moot.  (Docket No. 29.)

27       [2]  Plaintiff's motion for an extension of time within which to file his opposition is
28  GRANTED.  (Docket No. 32.)  Plaintiff's opposition, filed on July 27, 2015, is deemed timely
    filed.

1    court GRANTS defendants' motion for summary judgment.[3]

2                              **BACKGROUND**[4]

3          Inmates at PBSP are placed on a master ducat[5] list to attend a variety of appointments

4    such as religious, medical, dental, education, counseling, and law library visits. (Contreras Decl.

5    ¶ 3.)  A control booth officer informs those inmates about their daily ducats through the public

6    address system, and opens those inmates' cell doors at the appropriate times for them to attend

7    their appointments.  (*Id.*)  The inmates then leave their cells and go to the yard for processing.

8    (*Id.*)  Once they are processed, the inmates walk over to their respective programs without an

9    escort.  (*Id.*)

10         Prior to October 2, 2014, the PBSP Department Operations Manual Supplement section

11   101060.6.4 policy ("Inmate Attendance Policy") stated that any inmate who requested and

12   received a chapel ducat to attend chapel services, but failed to attend without a valid reason, was

13   taken off the ducat list for one month.  (Losacco Decl. ¶ 3.)  Examples of valid reasons are: the

14   inmate had a visitor; the inmate received an unexpected ducat; or the inmate was sick.

15   (Contreras Decl. ¶ 6.)  After that month was over, defendants state that the inmate could request

16   and receive a chapel ducat by submitting a CDCR 22 Form to the chaplain, talk to floor officer,

17   or otherwise let the chaplain know verbally or in other informal ways.  (Losacco Decl. ¶ 3;

18   Contreras Decl. ¶ 9.)  On the other hand, plaintiff states that once an inmate's one-month

19   suspension is over, the inmate is supposed to be automatically placed back on the ducat list.

20   (Opp. at 3.)

21         On April 14, 2014, plaintiff was scheduled to attend a Jehovah's Witnesses chapel

22   service.  (Contreras Decl. ¶ 8.)  When plaintiff was called to come out of his cell to attend the

23   service, plaintiff did not come out.  (*Id.*)  Plaintiff waved to the control officer in charge of

24

25         [3]  Plaintiff's motion for appointment of counsel is DENIED as moot.  (Docket No. 33.)

26         [4]  The following facts are taken in the light most favorable to plaintiff and are undisputed
27   unless otherwise indicated.

28         [5]  A ducat is similar to a permission slip.  (Contreras Decl. ¶ 2, n.1.)  An inmate who is
     placed on a ducat list has permission to attend daily appointments.  (*Id.*)

1   opening and closing the cell doors, to let the control officer know that plaintiff did not wish to

2   attend service that day.  (Pl. Decl. ¶ 4.)

3        At that time, Correctional Officer Contreras ("Contreras") was patrolling the chapel-

4   program area.  (Contreras Decl. ¶ 4.)  Contreras was tasked with standing in front of the chapel

5   door, and inmates listed on the chapel ducat list checked-in with Contreras before entering the

6   chapel area.  (*Id.*)  The inmates identify themselves to Contreras, and Contreras checks the

7   inmates' names with those on the ducat list.  (*Id.*)  After Contreras finishes checking in all the

8   inmates, Contreras looks through the chapel ducat list to find out if any inmates on the list did

9   not show up for chapel services.  (*Id.*)

10        On April 14, 2014, Contreras noted that plaintiff's name was on the ducat list, but

11   plaintiff did not check in for chapel service.  Contreras then checked to see if plaintiff had a valid

12   reason for not attending service.  (*Id.* ¶ 8.)  Contreras discovered that plaintiff had no visitors or

13   unexpected ducats, nor was he sick.  (*Id.*)  Pursuant to the Inmate Attendance Policy, Contreras

14   issued plaintiff a CDC-128B general chrono.[6]  (*Id.*)  Contreras informed plaintiff that plaintiff

15   would be removed from the chapel-ducat list from April 14, 2014 through May 14, 2014.  (*Id.*)

16        On May 22, 2014, plaintiff mailed a CDCR 22 Form to Contreras via institutional mail,

17   in which plaintiff stated that he had been denied "religious services" for more than thirty days.

18   (Compl., Ex. B.)  Plaintiff complained that he did not think he should be punished for any

19   amount of time for missing one religious service.  (*Id.*)  Contreras denies that he ever received

20   the CDCR 22 Form.  (Contreras Decl. ¶10.)

21        Also on May 22, 2014, plaintiff filed an administrative grievance ("602"), in which he

22   requested being placed on the chapel ducat list again, and requested the Inmate Attendance

23   Policy be discontinued.  (Compl., Ex. C.)  On July 10, 2014, at the second level of review,

24   plaintiff's appeal was partially granted in that he was placed back on the chapel ducat list.  (*Id.*,

25   Ex. D.)  The response to plaintiff's 602 also noted that the Inmate Attendance Policy was under

26   review.  (*Id.*)  Ultimately, on October 2, 2014, the Inmate Attendance Policy was changed.  (*Id.*)

27

28        [6] A CDC-128B general chrono is a non-disciplinary record of an inmate's behavior.
(Contreras Decl. ¶ 8, n.3.)

1  Under the revised policy, an inmate who receives a ducat for chapel services, but refuses to

2  attend service without a valid reason, is notified that he cannot receive a ducat and refuse it

3  without a valid reason, and if the problem persisted, the inmate could receive a rules violation

4  report.  (Contreras Decl. ¶ 7.)  The revised policy no longer removes the inmate from the chapel

5  ducat list for one month if the inmate misses a service without a valid reason.  (*Id.*)

6          Liberally construed, plaintiff's federal civil rights complaint alleges that defendant

7  Warden Ducart violated plaintiff's right to free exercise of religion by implementing the Inmate

8  Attendance Policy, and Contreras violated plaintiff's right to free exercise of religion by

9  enforcing the Inmate Attendance Policy.  (Compl. at 3.)

**DISCUSSION**

10

11  **I.    Rule 56(d) motion**

12          As an initial matter, plaintiff asks the court for a continuance or denial of defendants'

13  motion for summary judgment so that he may obtain a declaration from Jonathan Kling, the

14  Jehovah's Witnesses spiritual advisor at PBSP.  Defendants oppose the motion.

15          Federal Rule of Civil Procedure 56(d) is a device for litigants to avoid summary

16  judgment when the non-movant needs to discover affirmative evidence necessary to oppose the

17  motion.  *See Garrett v. San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987).  In making a Rule

18  56(d) motion, a party opposing summary judgment must make clear "what information is sought

19  and how it would preclude summary judgment."  *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir.

20  1998); *see, e.g., id.* at 853-54 (district court correctly denied motion for continuance to engage in

21  further discovery under Rule 56(d) where plaintiff did not provide any basis or factual support

22  for his assertions that further discovery would lead to the facts and testimony he described, and

23  his assertions appeared based on nothing more than "wild speculation").  Rule 56(d) requires that

24  the requesting party show (1) it has set forth in affidavit form the specific facts it hopes to elicit

25  from further discovery, (2) the facts sought exist, and (3) the sought-after facts are essential to

26  oppose summary judgment.  *See Family Home and Finance Center, Inc. v. Federal Home Loan*

27  *Mortgage Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).

28          The court has reviewed the following five facts that plaintiff asserts Chaplain Kling

would attest to under penalty of perjury: (1) PBSP inmates can only obtain The Watchtower magazine – a Jehovah's Witnesses magazine – through Chaplain King, and not through a subscription; (2) plaintiff is an active and regular member of the congregation; (3) there are currently only six Jehovah's Witnesses members in the B facility; (4) congregating is a central and essential tenet of the Jehovah's Witnesses faith, and there is no alternative that can take its place; (5) when an inmate is taken off the chapel ducat list for one month due to the Inmate Attendance Policy, the inmate automatically is placed back on the ducat list when the month concludes.  (Docket No. 40 at 2.)

The court will accept as true those facts that plaintiff claims Chaplain King would have provided in a declaration.  However, none of those facts create a genuine issue of material fact that would preclude summary judgment.  Thus, plaintiff's motion to continue or deny defendants' motion for summary judgment is DENIED.

## II.   Motion for Summary Judgment

### A.   Standard of Review

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence on a disputed material fact.  *See T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

It is not the task of the district court to scour the record in search of a genuine issue of

triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Plaintiff, as the nonmoving party, has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  *Id.*  "The district court need not examine the entire file for evidence establishing a genuine issue of fact."  *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29, 1031 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence).

### B.   **Analysis**

Defendants move for summary judgment on the following grounds: (1) that defendants are entitled to Eleventh Amendment immunity as to their official capacities; (2) that there is no genuine dispute of material fact as to whether defendants caused a constitutional deprivation; (3) that the Inmate Attendance Policy is reasonably related to legitimate penological interests; and (4) that defendants are entitled to qualified immunity.  The court addresses each in turn.[7]

### 1.   Official capacity immunity

The Eleventh Amendment bars from the federal courts suits against a state by its own citizens, citizens of another state or citizens or subjects of any foreign state.  *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 237-38 (1985).  "A state waives its Eleventh Amendment Immunity if it 'unequivocally evidence[s its] intention to subject itself to the jurisdiction of the federal court.'"  *Johnson v. Rancho Santiago Comm. Coll. Dist.*, 623 F.3d 1011, 1021 (9th Cir. 2010) (quoting *Hill v. Blind Indus. & Servs. Of Md.*, 179 F.3d 754, 758 (9th Cir. 1999)).  Unless a state has waived its Eleventh Amendment immunity, or Congress has overridden it, a state cannot be sued regardless of the relief sought.  *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (citing *Alabama v. Pugh*, 438 U.S. 781 (1978)).  This Eleventh Amendment immunity also extends to suits against state officials sued in their official capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985).

---

[7] Because the court grants defendants' motion for summary judgment, it is unnecessary to address defendants' additional argument that plaintiff's claim for punitive damages is without merit.

1    Plaintiff does not respond to defendants' argument that they are entitled to Eleventh

2   Amendment immunity in their official capacities. The court agrees with defendants that they are

3   entitled to Eleventh Amendment immunity from suits seeking liability from them in their official

4   capacities. *See id.* Accordingly, defendants' motion for summary judgment on plaintiff's claim

5   for damages against them in their official capacities is GRANTED.

6                    2.    Causation

7    Defendants argue that plaintiff has failed to show how defendants personally caused the

8   alleged constitutional deprivation. Plaintiff responds that Warden Ducart is liable because

9   Warden Ducart is responsible for the overall operations of PBSP, and Warden Ducart reviewed,

10   at least by designation, plaintiff's 602 appeal regarding this issue. (Opp. at 7-8.) Plaintiff also

11   argues that Contreras is liable because, had Contreras not issued plaintiff the CDC-128B chrono,

12   plaintiff would not have been removed from the chapel ducat list. (Opp. at 5-6.)

13    An inmate may be able to state a claim against the Warden or other supervisor of a

14   facility for promulgation or implementation of a policy. While liability may not be imposed on

15   supervisory personnel under the theory of respondeat superior, each defendant is liable for his or

16   her own misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Ewing v. City of Stockton*,

17   588 F.3d 1218, 1235 (9th Cir. 2009). A supervisor may be held liable only if he "participated in

18   or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v.

19   List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *accord Starr v. Baca*, 633 F.3d 1191, 1197 (9th Cir.

20   2011). A defendant may be held liable for promulgating or "implement[ing] a policy so

21   deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force

22   of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal

23   citations omitted); *Taylor*, 880 F.2d at 1045.

24    Here, the evidence is undisputed that Warden Ducart did not implement or promote the

25   Inmate Attendance Policy. (Ducart Decl. ¶ 6.) Warden Ducart is responsible for the overall

26   operations at PBSP, such as overseeing the budget, safety and security of all staff and inmates,

27   custodial operations, and inmate welfare. (*Id.* ¶ 3.) He approves general activities regarding

28   religious services, but does not take part in the day-to-day operations. (*Id.* ¶ 4.) In addition,

1  Warden Ducart delegates to Chief Deputy Bradbury the task of reviewing second-level appeal

2  reviews.  (*Id.* ¶ 3.)  Plaintiff's second level appeal response to plaintiff's 602 was reviewed and

3  signed by Chief Deputy Bradbury, and not by Warden Ducart.  (*Id.*)

4        Plaintiff does not provide any evidence to show that Warden Ducart was aware of,

5  personally participated in, or otherwise caused the implementation or promulgation of the Inmate

6  Attendance Policy.  Plaintiff's argument that Chief Deputy Bradbury's signature on plaintiff's

7  602 response means that Warden Ducart accepted responsibility for anything signed on his

8  behalf is an assumption without any factual support.  There are no facts to dispute defendants'

9  evidence that Warden Ducart did not implement the Inmate Attendance Policy, and was not

10  aware of it.  There is also an absence of evidence that Warden Ducart knew that plaintiff was

11  taken off the chapel ducat list pursuant to the Inmate Attendance Policy.

12        Thus, defendants' motion for summary judgment as to Warden Ducart is granted because

13  plaintiff has failed to show a genuine issue of a disputed fact as to whether Warden Ducart

14  implemented the Inmate Attendance Policy, or was aware of plaintiff's removal from the chapel

15  ducat list pursuant to the Inmate Attendance Policy.

16        As to Contreras, liability may be imposed on an individual defendant under 42 U.S.C. §

17  1983 if the plaintiff can show that a defendant's actions both actually and proximately caused the

18  deprivation of a federally protected right.  *See Lemire v. Cal. Dept. of Corrections &*

19  *Rehabilitation*, 726 F.3d 1062, 1085 (9th Cir. 2013); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.

20  1988).  A person deprives another of a constitutional right within the meaning of Section 1983 if

21  he does an affirmative act, participates in another's affirmative act, or omits to perform an act

22  which he is legally required to do, that causes the deprivation of which the plaintiff complains.

23  *See Leer*, 844 F.2d at 633.

24        Defendants state that Contreras cannot be liable for effectively removing plaintiff from

25  the ducat list because Contreras was merely following the prison's rules and procedures.

26  Defendants cite to no case law to support their argument.  On the other hand, plaintiff has

27  provided evidence showing that Contreras' act of issuing the CDC-128B chrono removed

28  plaintiff from the chapel ducat list, which caused the alleged violation of plaintiff's right to free

1   exercise of his religion.  *See Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) ("The

2   requisite causal connection can be established not only by some kind of direct personal

3   participation in the deprivation, but also by setting in motion a series of acts by others which the

4   actor knows or reasonably should know would cause others to inflict the constitutional injury.").

5   That Contreras was acting in compliance with the prison's rules does not necessarily negate

6   causation.  *Cf. id.* at 745 (recognizing that a "good faith defense" is an aspect of qualified

7   immunity).

8          Accordingly, defendants' motion for summary judgment on the basis of lack of causation

9   is GRANTED as to Warden Ducart, but DENIED as to Contreras.

10                                 3.    Merits

11         In order to establish a free exercise violation, a prisoner must show a defendant

12  substantially burdened the practice of his religion without any justification reasonably related to

13  legitimate penological interests.  *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008);

14  *see, e.g.*, *Bolds v. Cavazos*, No. 14-15176, 599 Fed. Appx. 307 (9th Cir. March 20, 2015)

15  (unpublished memorandum disposition) (dismissing Free Exercise Clause claim because inmate

16  failed to show that confiscation of television "substantially burdened" the practice of religion).

17         Here, the record shows that as a result of the Inmate Attendance Policy, plaintiff missed

18  four chapel services.[8]  (Contreras Decl. ¶ 9, n.4.)  That is, Contreras' involvement in plaintiff's

19  missed chapel services amounted to writing one CDC-128B chrono which removed plaintiff

20  from the chapel ducat list for one month.  These missed services were temporary, short-term, and

21  are the sort of "relatively short-term and sporadic" intrusions that do not amount to a substantial

22  burden on the prisoner's First Amendment free exercise rights.  *See Canell v. Lightner*, 143 F.3d

23

24         ───────────────────

25         [8]  The court notes that plaintiff argues that after his one-month suspension, he was
    supposed to be automatically placed back on the chapel ducat list.  Defendants, on the other
26  hand, state that after the one-month suspension, an inmate must request, either formally or
    informally, to be placed back on the chapel ducat list.  (Valuiski Decl. ¶ 4a.)  However, there is
27  no evidence that this procedure is part of the Inmate Attendance Policy, and plaintiff does not
    claim that the named defendants were responsible for plaintiff not being placed on the chapel
28  ducat list as soon as he was allowed to do so.  Thus, any dispute of fact regarding why plaintiff
    missed chapel services after the one-month suspension is not material.

1210, 1215 (9th Cir. 1998) (affirming summary judgment on claim that defendant violated Free

Exercise Clause by interrupting inmate's prayer time no more than 18 times over the course of 2

months because it was "relatively short-term and sporadic," and not a "substantial burden"); *see,*

*e.g.*, *Howard v. Skolnik*, No. 09-15382, 2010 WL 1253458, **1 (9th Cir. March 30, 2010)

(unpublished memorandum disposition) (affirming summary judgment on "First Amendment

claim concerning two alleged incidents where prison personnel interfered with Howard's fasting

because there was no genuine issue as to whether a substantial burden was placed on Howard's

free exercise of religion").

Accordingly, defendants are entitled to summary judgment because there is no genuine

issue of material fact that the temporary prohibition of attending chapel services was a

substantial burden on plaintiff's free exercise of religion.

Alternatively, even assuming that the Inmate Attendance Policy established a substantial

burden of plaintiff's religious exercise, defendants are entitled to summary judgment because the

Inmate Attendance Policy was reasonably related to legitimate penological interests. *See*

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78,

89 (1987)).  The district court must draw all justifiable inferences in plaintiff's favor by

distinguishing between evidence of disputed facts and disputed matters of professional judgment.

With respect to the latter, the court's inferences must accord deference to the views of prison

authorities. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).  Unless plaintiff can point to

sufficient evidence showing the policy is not reasonably related to legitimate penological

objectives to allow him to prevail on the merits, he cannot prevail at the summary judgment

stage. *See id.* at 530.

In order to determine if the regulation is reasonably related to legitimate penological

interests, the court must consider four factors: (1) whether a valid, rational connection exists

between the regulation and a legitimate governmental interest; (2) whether there are alternative

means of exercising the right that remains open to the inmate; (3) "the impact accommodation of

the asserted constitutional right will have on guards and other inmates, and on the allocation of

prison resources generally"; and (4) whether there is an absence of ready alternatives and the

1   existence of easy and obvious alternatives.  *Turner*, 482 U.S. at 89-91; *see Beard*, 548 U.S. at

2   532-33 (noting that application of the *Turner* factors does not turn on balancing the factors, but

3   on determining whether the defendants show a reasonable relation, as opposed to merely a

4   logical relation).

5                             a.      Valid, rational connection

6           First, defendants assert that the Inmate Attendance Policy has a valid, rational connection

7   to legitimate penological interests.  Legitimate penological interests include "the preservation of

8   internal order and discipline, the maintenance of institutional security against escape or

9   unauthorized entry, and the rehabilitation of the prisoners."  *Procunier v. Martinez*, 416 U.S.

10  396, 412 (1974) (footnote omitted), *limited by Thornburgh v. Abbott*, 490 U.S. 401 (1989).  In

11  determining whether there is a valid, rational connection to legitimate penological interests, the

12  initial burden is on defendants to put forth a "common sense" or intuitive connection between

13  their policy and a legitimate penological interest.  *See Frost v. Symington*, 197 F.3d 348, 357

14  (9th Cir. 1999).  When an inmate does not present enough evidence to refute this common sense

15  connection between the prison regulation and the objective, the court is to presume the

16  governmental objective is legitimate and neutral and *Turner*'s first prong is satisfied.  *See Ashker*

17  *v. California Dept. of Corrections*, 350 F.3d 917, 923-24 (9th Cir. 2003); *Frost*, 197 F.3d at 357.

18  On the other hand, when an inmate presents evidence that refutes a common sense connection

19  between a legitimate objective and the prison regulation, the state then must present enough

20  counter-evidence to show that the connection is not so "remote as to render the policy arbitrary

21  or irrational."  *Ashker*, 350 F.3d at 923; *Frost*, 197 F.3d at 357.

22          Defendants argue that the Inmate Attendance Policy helped to promote safety and

23  security concerns by acting as a deterrent to inmates who request and receive a chapel ducat but

24  do not actually attend chapel services.  (Ducart Decl. ¶ 8.)  Because PBSP is a maximum-

25  security prison, it was especially important for prison officials to know where the inmates were

26  at all times.  (*Id.*)  Inmates had previously requested and received placement onto the chapel

27  ducat list for the sole reason of leaving their cells, but not to actually attend chapel service.  (*Id.*)

28  When that occurred, the officers had difficulty keeping track of where all the inmates were once

1   they were released into the yard.  (*Id.*)  Some of those inmates who had received placement onto

2   the chapel ducat list but did not attend chapel instead played basketball in the yard, caused

3   trouble, or started fights.  (*Id.*)  The Inmate Attendance Policy thus served the purpose of

4   deterring inmates from signing up for a chapel ducat and then not attending service without a

5   valid reason by removing those inmates from the chapel ducat list for one month.  (*Id.*)  This

6   deterrent was aimed at encouraging inmates to report to the chapel as stated on the ducat list by

7   giving them a consequence for failing to show up without a valid reason, and making it easier for

8   officers to be able to track the inmates' locations.  (Contreras Decl. ¶ 13.)

9        Defendants also argue that the Inmate Attendance Policy addressed the issue of limited

10   chapel capacity.  (Contreras Decl. ¶ 12.)  Facility B, where plaintiff was housed, contained more

11   than 600 inmates.  (*Id.*)  At most, approximately thirty inmates are allowed into the chapel at any

12   given time.  (*Id.*)  More inmates wanted to attend chapel service than there was available space.

13   (Ducart Decl. ¶ 9.)  Defendants contend that the Inmate Attendance Policy ensured that an

14   inmate who refused to attend chapel service without a valid reason would be taken off the ducat

15   list for one month, thereby opening up an opportunity for other inmates who want to attend.

16   (Contreras Decl. ¶ 12,)

17        These two main objectives are legitimate, and their connection to the Inmate Attendance

18   Policy pass the "common sense" standard.  *See Frost*, 197 F.3d at 357; *see, e.g.*, *Beard*, 548 U.S.

19   at 531-33 (recognizing that depriving inmates of certain privileges "is a proper and even

20   necessary management technique to induce compliance with the rules of inmate behavior");

21   *Overton v. Michigan Dept. of Corrections*, 539 U.S. 126, 134 (2003) ("[w]ithdrawing . . .

22   privileges is a proper and even necessary management technique to induce compliance with the

23   rules of inmate behavior, especially for high-security prisoners.").

24        Plaintiff attempts to refute this "common sense" connection by stating that defendants

25   have produced no evidence to show that removal of inmates for a one-month period for failing to

26   attend chapel services has actually encouraged inmates to attend chapel services.  (Opp. at 9.)

27   Plaintiff goes on to say that there is no evidence that any inmates took advantage of chapel

28   ducats and played basketball, caused trouble, or started fights instead of attending chapel

1    services.  (*Id.* at 9-10.)  Plaintiff also argues that there are only six Jehovah's Witnesses on B

2    facility, and thus there is no waiting list for other Jehovah's Witnesses to attend chapel service.

3    (*Id.* at 11.) Plaintiff further states that, if the Inmate Attendance Policy was aimed at maintaining

4    order and relieving important safety and security concerns, then the Inmate Attendance Policy

5    should also apply to those inmates who decline their law library or medical ducats.  (*Id.* at 10.)

6    Plaintiff explains that he had previously refused or did not show up for three law library ducats,

7    but was never issued any disciplinary action.[9]  (*Id.*; Pl. Decl., ¶ 10 and Attachment.)

8            At this stage, however, defendants are not required to "make an evidentiary showing

9    concerning the connection."  *Frost*, 197 F.3d at 357.  Only when a plaintiff presents sufficient

10   evidence that refutes the "common sense" connection are defendants required to provide

11   "enough counter-evidence to show that the connection is not so 'remote as to render the policy

12   arbitrary or irrational.'"  *Id.* (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999).

13   Here, plaintiff's argument that defendants failed to prove that the Inmate Attendance Policy in

14   fact promoted the safety and security of prison officials, and maintained order and discipline

15   does not refute the "common sense" connection.  *See Mauro*, 188 F.3d at 1060 (stating that

16   defendants' initial burden of showing a "common sense" connection need only demonstrate that

17   "defendants' judgment was 'rational,' that is, whether the defendants might reasonably have

18   thought that the policy would advance its interests").  Plaintiff's assertion that there are only six

19   Jehovah's Witnesses in his facility to show that there is no waiting list to attend Jehovah's

20   Witnesses services also does not refute the "common sense" connection because it is

21   unpersuasive without an allegation that defendants knew the number of Jehovah's Witnesses

22   totaled six inmates.  Even assuming there is no waiting list to attend Jehovah's Witnesses

23   services, plaintiff does not provide facts regarding the number of inmates who may attend other

24   religious services to refute defendants' statement that for larger services, there are waiting lists

25   for inmates who want to attend chapel but cannot because of the limited space.  (Valuiski Decl. ¶

26

27          [9]  Although plaintiff declares that he refused or did not show up for three law library

28   ducats, the attachment to his declaration shows only two instances where he refused or did not
     show up.  (Pl. Decl. Attachment.)

6.)  Plaintiff also argues that the consequence of removing an inmate from a ducat list for one month should have applied to other ducats if defendants were indeed concerned about safety and security.  However, not applying a one-month removal consequence to other ducats does not minimize a "common sense" connection between the Inmate Attendance Policy and defendants' legitimate penological purpose.  A chapel service requires a congregation of inmates which is facially a greater security risk than that resulting from a medical or law library ducat because having a medical or law library ducat does not presuppose a gathering of many inmates at one time in one location.

In sum, defendants have shown that a "common sense" connection between the Inmate Attendance Policy and their stated legitimate penological interests are reasonable.  *See Frost*, 197 F.3d at 355 ("[A]s long as it is plausible that prison officials believed the policy would further a legitimate objective, the governmental defendant should prevail on *Turner*'s first prong.").  Having found that plaintiff has not produced sufficient evidence to refute defendants' stated "common sense" connection, the court finds that defendants have satisfied the first *Turner* prong.

### b.    Alternative Means

Under the second *Turner* factor – the availability of alternatives – "[t]he relevant inquiry . . . is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the court must] determine whether the inmates have been denied all means of religious expression."  *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987)).  "Also relevant to the evaluation of the second factor is a distinction *O'Lone* had no occasion to make: the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his [or her] soul."  *Ward*, 1 F.3d at 878; *compare id.* (concluding that where prison officials have deprived Orthodox Jewish prisoner of kosher diet, a rabbi, and religious services, the second *Turner* factor weighs in the prisoner's favor), *with id.* at 880 (concluding that prisoner's request not to be transported on the Sabbath was not reasonable under second *Turner* factor because prisoner had many opportunities

1   to observe the Sabbath).

2       Defendants argue that plaintiff had alternative means of religious expression because he

3   had access to religious literature and books, including Jehovah's Witnesses bibles and The

4   Watchtower, which is a Jehovah's Witnesses magazine that contains teachings, bible passages,

5   prophecies, and illustrations.  (Losacco Decl. ¶ 8.)  A Jehovah's Witnesses inmate may also

6   request a chaplain to provide cell-front visits to answer questions, share religious messages, and

7   pray with the inmates.  (*Id.*)  Plaintiff responds that he does not have access to religious material

8   such as The Watchtower because The Watchtower can only be obtained through Jehovah's

9   Witnesses' Chaplain and spiritual advisor, Jonathan Kling.  (Opp. at 11.)

10      However, plaintiff does not dispute that even though plaintiff did not possess The

11  Watchtower during his one-month suspension from chapel services, he was not denied the use

12  of, or access to, The Watchtower and Jehovah's Witnesses bibles.  There is no evidence to

13  suggest that plaintiff was prevented from requesting The Watchtower from Chaplain Kling, or

14  that Chaplain Kling was unable to distribute The Watchtower to plaintiff.  In addition, plaintiff

15  does not dispute that cell-front visits by the chaplain for prayer, religious messages, or questions

16  were available to him.  Thus, there are no genuine issues in dispute regarding whether plaintiff

17  had an alternative means of religious expression, nor is there any evidence which shows plaintiff

18  was "denied all means of religious expression."  *Ward*, 1 F.3d at 877; *see also O'Lone*, 482 U.S.

19  at 352 (holding that the second *Turner* factor is satisfied if a prison allows prayer and discussion,

20  access to an imam, and observance of Ramadan, even if inmates could not attend a weekly

21  religious service).  In addition, there is no evidence to suggest that temporarily denying plaintiff

22  from attending weekly Jehovah's Witnesses chapel service is "forbidden" by his religion or that

23  attending weekly chapel services is a religious commandment.  *Ward*, 1 F.3d at 878.  Thus, the

24  second *Turner* factor weighs in favor of defendants.

25                          c.      Impact on others

26      "A third consideration [to determine whether a challenged policy is reasonable] is the

27  impact accommodation of the asserted constitutional right will have on guards and other inmates,

28  and on the allocation of prison resources generally."  *Turner*, 482 U.S. at 90.  "When

1  accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or

2  on prison staff, courts should be particularly deferential to the informed discretion of corrections

3  officials."

4          Here, defendants assert that allowing plaintiff to continue to refuse to attend chapel

5  services for no valid reason without any consequence would strain institutional resources.

6  Specifically, defendants state that it would require chaplains to expend time and resources for no

7  reason, and prevents inmates on a waiting list to attend chapel from attending.  (Valuiski Decl. ¶

8  6.)  Defendants also argue that more officers would be needed at the institution to ensure that

9  inmates who are released for chapel services but do not attend are not engaging in nefarious

10  activities.  (MSJ at 16.)

11          This an insufficient evidentiary showing.  Although prison officials' assessments of the

12  burden on prison operations are generally entitled to deference, when evaluating the third *Turner*

13  factor, the Ninth Circuit has clarified that "we cannot simply accept the warden's assertion [] that

14  the disruption would be significant" without specific findings.  *Ward v. Walsh*, 1 F.3d 873, 878-

15  79 (9th Cir. 1993).  Here, there is no evidence that prison officials conducted any investigation

16  on the impact of accommodating plaintiff, or studied in detail what effect an accommodation

17  would have on operating expenses or institutional resources.  *See Shakur v. Schiro*, 514 F.3d

18  878, 887 (9th Cir. 2008) (noting that in order to prevail on the third *Turner* factor, the prison

19  should provide evidence that the prison actually looked into or studied the effects that an

20  accommodation would have on operating expenses).  Thus, this third *Turner* factor does not

21  support a reasonable relation between the Inmate Attendance Policy and legitimate penological

22  interests.

23                          d.    Presence of ready alternatives

24          Under the fourth and final *Turner* factor, whether the regulation is an "exaggerated

25  response" to the prison's concerns, the prisoner must show there are "obvious, easy alternatives"

26  to the regulation that "fully accommodate the prisoner's rights at *de minimis* cost to valid

27  penological interests."  *Turner*, 482 U.S. at 90-91.  The burden is on the plaintiff to show that

28  there are obvious and easy alternatives to the challenged policy.  *See Mauro*, 188 F.3d at 1061;

1    *Turner*, 482 U.S. at 90-91 ("if an inmate claimant can point to an alternative that fully

2    accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may

3    consider that as evidence that the regulation does not satisfy the reasonable relationship

4    standard."). "This is not a 'least restrictive alternative' test: prison officials do not have to set up

5    and then shoot down every conceivable alternative method of accommodating the claimant's

6    constitutional complaint." *Turner*, 482 U.S. at 91. Instead, the proper inquiry is "whether the

7    prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted

8    right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton v.*

9    *Bazzetta*, 539 U.S. 126, 135-36 (2003).

10          Here, plaintiff's only suggestion for an alternative is to not have the Inmate Attendance

11   Policy in place. (Opp. at 12-13.) Plaintiff does not propose a less restrictive limitation as a

12   potential alternative. Moreover, plaintiff does not provide any evidence as to why the Inmate

13   Attendance Policy is an "exaggerated response" to prison concerns. Put simply, plaintiff does

14   not demonstrate that a ready alternative existed. While PBSP might be able to implement a less

15   restrictive limitation, plaintiff has not provided a material dispute as to the availability of a ready

16   alternative. Even if the court were to construe that the current revised Inmate Attendance Policy

17   was a ready alternative, plaintiff has not shown or argued that such a change involved *de minimis*

18   costs to valid penological interests. Thus, the fourth *Turner* factor weighs in favor of defendants.

19          In addition, it is important to note that *Beard* expressly recognized that the second, third,

20   and fourth *Turner* factors are "poorly suited to determining the validity of inmate privilege

21   deprivation policies. When the "valid penological objectiv[e]" of a prison policy is encouraging

22   compliance with prison rules, it makes little sense to inquire into the impact accommodation of

23   the asserted constitutional right will have on guards and other inmates, and on the allocation of

24   prison resources generally, or into the availability of "ready alternatives." At best, such inquiries

25   merely collapse the third and fourth factors into the first, because accommodating the exercise of

26   the deprived right will undermine the incentive effects of the prison policy and because the

27   unavailability of "ready alternatives" is typically (as in this case) one of the underlying rationales

28   for the adoption of inmate privilege deprivation policies." *Beard*, 548 U.S. at 541-42 (Thomas,

1   J., concurring) (internal quotation marks omitted).

2        Taking that difficulty into consideration, and applying the *Turner* factors to this case, the

3   court finds that even if the Inmate Attendance Policy was a substantial burden on plaintiff's First

4   Amendment rights, it was nevertheless valid because it set forth a reasonable relation to a

5   legitimate penological interest.  Plaintiff has not provided sufficient evidence to show that, in

6   light of the importance of the Free Exercise Clause, the Inmate Attendance Policy, which

7   temporarily deprived plaintiff of the ability to attend chapel service was unreasonable.  *Cf.*

8   *Beard*, 548 U.S. at 535 (noting that the severe policy restriction prohibiting all newspapers,

9   magazines, and photographs to a particular group of inmates might be unreasonable if the policy

10  was a *de facto* permanent ban, as opposed to one aimed at modifying inmate behavior).

11       Because plaintiff has failed to provide sufficient evidence of a First Amendment violation

12  for a reasonable jury to return a verdict in his favor, defendants' motion for summary judgment

13  is granted.

14                    4.   Qualified Immunity

15       Alternatively, defendants argue that they are entitled to qualified immunity.  The defense

16  of qualified immunity protects "government officials . . . from liability for civil damages insofar

17  as their conduct does not violate clearly established statutory or constitutional rights of which a

18  reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A

19  court considering a claim of qualified immunity must determine whether the plaintiff has alleged

20  the deprivation of an actual constitutional right and whether such right was clearly established

21  such that it would be clear to a reasonable officer that his conduct was unlawful in the situation

22  he confronted.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).  Regarding the first prong,

23  the threshold question must be, taken in the light most favorable to the party asserting the injury,

24  do the facts alleged show the officer's conduct violated a constitutional right?  *Saucier v. Katz*,

25  533 U.S. 194, 201 (2001).  The inquiry of whether a constitutional right was clearly established

26  must be undertaken in light of the specific context of the case, not as a broad general proposition.

27  *Id.* at 202.  The relevant, dispositive inquiry in determining whether a right is clearly established

28  is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

1  he confronted.  *Id.*

2        Here, the law was clearly established that a prison regulation that impinges on an

3  inmate's First Amendment rights is valid if it is reasonably related to legitimate penological

4  interests.  *See O'Lone v. Estate of Shabazz*, 482 U.S. at 349.  "[A] right is clearly established

5  only if its contours are sufficiently clear that 'a reasonable official would understand that what

6  he is doing violates that right.'  In other words, 'existing precedent must have placed the

7  statutory or constitutional question beyond debate.'"  *Carroll v. Carman*, 135 S. Ct. 348, 350

8  (2014) (citations omitted).  "[I]f officers of reasonable competence could disagree on [the] issue,

9  immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

10        Moreover, the qualified immunity inquiry "must be undertaken in light of the specific

11  context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198

12  (2004).  To do so, a court must define the right more narrowly than the constitutional provision

13  guaranteeing the right, but more broadly than the total factual circumstances surrounding the

14  alleged violation.  *See Watkins v. City of Oakland, California*, 145 F.3d 1087, 1092-93 (9th Cir.

15  1998).  Such specificity does not mean qualified immunity exists "unless the very action in

16  question has previously been held unlawful," but does require that "in the light of pre-existing

17  law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

18        With these principles in mind, the constitutional question to be addressed here is not the

19  general proposition espoused in *O'Lone*, but a more narrow one: whether a prisoner's right to

20  free exercise is denied when he is temporarily prohibited from attending weekly chapel services.

21  *See, e.g.*, *May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997) (recognizing *O'Lone* as establishing

22  that prisoners retained protections of the free exercise clause, but defining the right as whether

23  the prison's hair search procedure violated prisoners' right to free exercise of religion).

24        The plaintiff bears the burden of proving the existence of a "clearly established" right at

25  the time of the allegedly impermissible conduct.  *See Maraziti v. First Interstate Bank*, 953 F.2d

26  520, 523 (9th Cir. 1992).  Here, plaintiff merely asserts that the right to free exercise is clearly

27  established, and fails to provide any case law to support a less general proposition.  The court

28  has conducted a search for cases discussing whether prison officials violated the Free Exercise

1   Clause when they temporarily prohibit inmates from attending chapel services, and found no

2   applicable United States Supreme Court or Ninth Circuit cases.  *See Community House, Inc. v.*

3   *Bieter*, 623 F.3d 945, 967 (9th Cir. 2010) (citing *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir.

4   1996)).   In the absence of binding precedent, the court may look to all available decisional law,

5   including the law of other circuits and district courts.  *See id.*; *Carrillo v. County of Los Angeles*,

6   798 F.3d 1210, 1223 (9th Cir. 2015) (only in absence of decisional authority by the United States

7   Supreme Court or Ninth Circuit are other sources of decisional law, such as out-of-circuit cases,

8   considered).   Though there are a handful of out-of-circuit cases that have found temporary

9   deprivations of chapel services to be constitutional, the court has not uncovered any cases that

10  have found the teporary deprivation to be unconstitutional.  *See, e.g.*, *Matiyn v. Henderson*, 841

11  F.2d 31, 37 (2d Cir. 1988) (restricting an inmate from attending communal services temporarily

12  while inmate was in administrative segregation was reasonable); *Hadi v. Horn*, 830 F.2d 779,

13  788 (7th Cir. 1987) (occasional and sporadic cancellations of religious services in prison did not

14  violate First Amendment).

15      Based on the lack of clear case law establishing that the Free Exercise Clause prohibits

16  prisons from temporarily denying inmates the right to attend chapel services, the court concludes

17  that plaintiff's First Amendment right was not clearly established.

18      Whether a reasonable official could have believed the action taken was lawful is a mixed

19  question of law and fact: "It involves an objective test of whether a reasonable official could

20  have believed that his conduct was lawful in light of what he knew and the action he took."

21  *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995).  Here, the

22  record shows that Warden Ducart did not implement the Inmate Attendance Policy, and

23  otherwise did not know that plaintiff was subject to it in April 2014.  Thus, a reasonable officer

24  in Warden Ducart's position could have believed that his conduct of not discontinuing the

25  Inmate Attendance Policy earlier was lawful.  The record also shows that Contreras' action of

26  submitting a CDC-128B Form, which caused plaintiff to be removed from the chapel ducat list

27  for one month, was done pursuant to PBSP's Inmate Attendance Policy.  Contreras' job on April

28  14, 2014 was to patrol the chapel-program area and check in inmates. (Contreras Decl. ¶¶ 4, 5,

8.)  Because the law was not clearly established, and the evidence is undisputed that Contreras was acting pursuant to PBSP's Inmate Attendance Policy, a reasonable officer could have believed that Contreras' actions were lawful.

In sum, because plaintiff's right to free exercise was not clearly established in this situation, the court concludes that a reasonable official in defendants' positions would not have believed that temporarily denying plaintiff the right to attend chapel services in compliance with the Inmate Attendance Policy would be unlawful.

## CONCLUSION

Defendants' motions for summary judgment is GRANTED.  The Clerk shall terminate any pending motions, enter judgment, and close the file.

IT IS SO ORDERED.

DATED:  2/8/2016

*Lucy H. Koh*

LUCY H. KOH
United States District Judge